# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 19, 2015

## STATE OF TENNESSEE v. JERRY RICHARD MASINGO

**Appeal from the Criminal Court for Union County**
**No. 4660      E. Shayne Sexton, Judge**

**No. E2014-01074-CCA-R3-CD - Filed June 30, 2015**

The Defendant, Jerry Richard Masingo, was convicted by a Union County Criminal Court jury of voluntary manslaughter, a Class C felony. *See* T.C.A. § 39-13-211 (2014). The trial court sentenced the Defendant as a Range I, standard offender to six years' confinement. On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the trial court abused its discretion by imposing a six-year sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Jordan C. Long, Knoxville, Tennessee, for the appellant, Jerry Richard Masingo.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Lori Phillips-Jones, District Attorney General; and Tracy Tipton Jenkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the death of Arlos Masingo, the Defendant's brother. At the trial, Patricia Masingo testified that she and the victim had been married thirty-eight years at the time of the victim's death. On September 11, 2012, the victim was found non-responsive inside his truck outside a bar called The Shack. Ms. Masingo last saw the victim at their home around 3:00 or 4:00 p.m. on September 10, when he was wearing boots, shorts, a shirt, and a ball cap. Ms. Masingo left home after the victim and returned home around midnight. The victim's truck was not at the house. Ms. Masingo identified a photograph of the truck

and stated that she learned the victim and his truck were found at The Shack. Ms. Masingo went to the bar and found the victim non-responsive, lying on the floorboard of the truck.

Ms. Masingo testified that she did not speak to the Defendant on the night of September 10, 2012, although the Defendant knew her telephone number and where she and the victim lived. She said the Defendant also knew her three sons' telephone numbers and addresses. She said the Defendant did not contact her after the victim was found, did not come to the hospital, and never apologized. Ms. Masingo dispensed the victim's pain and blood pressure medications in the morning and Xanax at bedtime, and she said the victim was healthy when he left home on September 10. She said that to her knowledge, the victim was not drinking alcohol that day. She did not know anyone who "had a problem" with the victim.

On cross-examination, Ms. Masingo testified that the victim was driving an ATV without a helmet when he left home around 3:00 or 4:00 p.m. The ATV was in good condition and had not been wrecked recently. Ms. Masigno said the victim routinely wore a bandage around his leg because of a previous leg injury. She gave the victim his blood pressure and pain medications earlier that morning. She agreed the victim was not wearing his cap when she found him inside his truck, although it was inside the truck.

Travis Masingo, the victim's son, testified that on September 11, 2012, before 9:00 a.m., he found the victim lying inside the victim's truck at The Shack. He took a photograph of the victim lying inside the truck because he knew something was wrong and said he attempted unsuccessfully to wake the victim. The victim had no visible injuries. He said the victim did not smell of alcohol.

Mr. Masingo testified that he last saw the victim sometime on September 10, 2012. He said that although the Defendant was his uncle, the Defendant did not contact him or his wife on the night of September 10, did not come to the hospital, did not attend the victim's funeral, and did not apologize for what happened to the victim.

On cross-examination, Mr. Masingo testified that he had searched previously for the victim after the victim had been drinking. He denied he had ever found the victim unconscious in his truck and said he always "got [to the victim] before he got to that point." He did not see any cigarettes outside the victim's truck window. He said he first learned of the victim's head trauma at the hospital.

Duane Warren testified that his father, Ed Warren, owned The Shack where he worked. He said he cleaned the parking lot daily and identified a portion of a cinder block he found at the front of the parking lot on September 12, 2012. Although Mr. Warren did

not know what happened to the victim, he saw the victim inside his truck around 8:15 a.m. on September 11. The victim was not moving, but Mr. Warren heard him snoring. He said the victim did not speak or communicate. He left to purchase building materials and returned later.

Mr. Warren testified that on September 12, 2012, he spoke to the Defendant at The Shack. Mr. Warren asked the Defendant if he knew the victim was in the hospital. The Defendant said he knew and admitted he "smacked" the victim a couple of times. Mr. Warren did not work on September 10.

On cross-examination, Mr. Warren testified that he cleaned the parking lot daily because patrons discarded trash in the parking lot. He agreed the cinder block was not in the parking lot on September 11. He denied there were cinder blocks in the vicinity. On redirect examination, he clarified that he saw the cinder block the day after the incident.

Union County Sheriff's Detective Phillip Johnson testified that he responded to the hospital on September 11, 2012, and that the victim died the following day. He interviewed the Defendant before the victim's autopsy. The Defendant's statement was read to the jury. In the statement, the Defendant said that on September 10, 2012, he and Troy Johnson were at "old Judy's bar" when Mr. Johnson received a telephone call from his girlfriend, Tracy Williams, requesting they pick her up from work at The Shack. The Defendant and Mr. Johnson drove to the bar in Mr. Johnson's car and arrived around 10:00 p.m. The Defendant said he entered the bar and drank one beer. The Defendant saw Joe Brummett, Mary Edwards, Ed Warren, Ms. Williams, and the victim. The victim sat near the Defendant.

The Defendant stated the victim wanted to discuss their mother, but the Defendant told the victim that he was "not listening to this." He said the victim felt like the victim cared for their mother more than anyone else. Ed Warren announced the bar was closing, and the victim left the bar through the back door. The Defendant, Ms. Williams, Mr. Johnson, and Mr. Warren left through the front door. The Defendant said the victim appeared outside the front door and told the Defendant that he wanted to talk. Mr. Warren and Ms. Williams went inside. The victim walked toward the Defendant and Mr. Johnson, who was standing beside the Defendant. The Defendant said he still did not want to talk to the victim, and Mr. Johnson got between them. The victim stepped around Mr. Johnson, and the Defendant admitted he slapped "the s---" out of the left side of the victim's face. He denied hitting the victim with his fist. The Defendant said that the victim fell to the ground but that he did not think the victim fell hard enough to cause injuries. After the victim fell, the Defendant sat on the porch of the bar, and the Defendant thought Mr. Warren and Mr. Johnson placed the victim inside the truck. The Defendant, Mr. Johnson, and Ms. Williams left in Mr. Johnson's car and drove to the Defendant's house for dinner.

The Defendant stated he did not hear the victim say anything after falling. The Defendant did not know if the victim could walk and stated that he did not help place the victim inside the truck. The Defendant said he asked Mr. Johnson if the victim was okay, and Mr. Johnson said, "[Y]es." The Defendant stated that he told the victim two or three times he did not want to discuss their mother and that the victim should have gone home.

Detective Johnson testified that he interviewed Ms. Williams and Mr. Johnson after speaking with the Defendant and that he spoke to the Defendant again on September 18, 2012. The Defendant provided a statement, which was read to the jury. In the statement, the Defendant told the detective that he wanted to "change a few things" in his previous statement. The Defendant clarified that he did not know if Ms. Williams returned to the bar or went to her car. The Defendant said he did not recall seeing Ms. Williams outside after he left the bar. The Defendant also stated that Mr. Johnson did not get between him and the victim and admitted his previous statement that the victim stepped around Mr. Johnson was untrue. The Defendant said the victim "just kept coming towards me. This is when I slapped him." The Defendant maintained that he did not help the victim inside the truck and that he sat on the porch.

Detective Johnson identified a photograph depicting what he thought were drag marks in the unpaved parking lot from the corner of the building where the incident occurred to the victim's truck. He said the drag marks were consistent with where the Defendant said the victim was standing before falling. He also identified a photograph of portions of a cinder block found at the scene and said they were found about ten yards from where the victim fell. He said no additional pieces of cinder block were found in the parking lot.

Detective Johnson testified that the victim's cap was found inside the truck and that it was not analyzed by the Tennessee Bureau of Investigation (TBI) because the inside of the truck was dirty, the hat was found days later under where the victim had lain, and there were conflicting statements about whether the victim was wearing it at the time of the incident. He agreed the victim had no visible signs of injuries.

Detective Johnson testified that he observed the autopsy and that the medical examiner found a mark under the skin of the left side of the head, which was consistent with one of the pieces of cinder block found at the scene. He said that the rear right side of the victim's skull was cracked, which was consistent with the victim's falling backward and hitting his head.

On cross-examination, Detective Johnson testified that the pieces of cinder block did not have blood or hair on them, and they were not analyzed by the TBI. Relative to where the victim was found inside the truck, Mr. Johnson told the detective that he and someone else placed the victim across the seat. Detective Johnson said Mr. Johnson admitted that he

saw the Defendant strike the victim in the head and that the victim hit the ground. Although he could not recall if Mr. Johnson said the Defendant slapped or hit the victim, he knew Mr. Johnson did not say the Defendant had something in his hand. He agreed Mr. Johnson was the only witness to the incident. Detective Johnson said he concluded that the Defendant used the cinder block based upon Duane Warren's statement that he cleaned the parking lot daily and that the cinder block was not found before the incident.

Detective Johnson testified that the victim had scrape marks on his back and cuts on his elbows and arms, which were consistent with the victim's being pulled or dragged across the ground and falling backward. He did not see any injuries to the victim's head. He said the victim's head injury was consistent with a piece of cinder block about two inches long. Detective Johnson believed that the victim was wearing his cap at the time he was struck and denied that the cinder block would have touched the victim's skin.

Detective Johnson testified that he investigated other possible causes for the victim's head trauma, including whether the victim was involved in a motor vehicle accident. He found no visible damage to the victim's truck. Although he did not examine the victim's ATV, he said the victim's family would have notified him if it had been damaged.

On redirect examination, Detective Johnson testified that Mr. Johnson stated that the Defendant and the victim "had gotten in to it" inside the bar. He agreed Mr. Johnson said the Defendant "put [the victim] on the floor" while the victim was sitting in a chair.

On recross-examination, Detective Johnson testified that his investigation showed that Mr. Johnson and Ms. Williams unsuccessfully attempted to place the victim inside his truck while the Defendant sat on the porch and refused to help. Mr. Johnson and Ms. Williams left the bar to find Ed Warren and to request his help. Mr. Johnson and Ms. Williams returned with Mr. Warren.

Chief Deputy Medical Examiner Christopher Lockmuller, an expert in forensic pathology, performed the victim's autopsy and concluded that the cause of death was blunt force trauma to the head. Dr. Lockmuller found a large bruise on the left side of the victim's brain caused by blunt force trauma. He said the bruise alone was not fatal, but he found bruising on the right side of the head that extended to the skin and muscle under the scalp. He said the bruise on the right side could have been caused by falling to the ground. The victim also sustained a skull fracture to the right side of his head, and Dr. Lockmuller found bleeding overlying the brain. He could not determine if immediate medical treatment would have prevented the victim's death but said the brain injuries would not have been easily treated, which would have increased the likelihood of death.

Dr. Lockmuller testified that the brain injuries were significant enough to cause bleeding on the brain and the formation of blood clots. He said that the collection of blood around the left side of the brain was large enough to push the brain from left to right. He concluded that the victim probably would have been unconscious and unable to communicate after sustaining the head trauma. He said it was unlikely but not impossible that the victim could have smoked a few cigarettes while sitting inside his truck before losing consciousness.

Dr. Lockmuller testified that the portion of the cinder block recovered from the scene could have caused the injury to the left side of the victim's head, and he identified photographs of his comparing the cinder block piece to the victim's injuries. He identified photographs of the victim's left elbow and forearm depicting scabbed abrasions and said the injuries were consistent with the victim's falling backward to the ground. Relative to Mr. Warren's testimony that the victim was snoring the morning after the assault, Dr. Lockmuller stated that although the victim was snoring, he was unconscious. The toxicology report showed the victim did not have alcohol in his blood, but a small, unquantifiable amount of benzodiazepine, used to treat anxiety, was detected.

On cross-examination, Dr. Lockmuller testified that he did not find any "transference" on the victim from the cinder block. He said that it was possible no transference occurred but that if it occurred, it could have been removed when the victim was removed from the truck or at the hospital when the staff cleaned the victim's head. He did not find transference on the cinder block from the victim. He said that although the cinder block was consistent with causing the head wound, other objects could have caused the wound. Dr. Lockmuller was advised before performing the autopsy that the victim sustained a head injury as a result of a possible assault.

Dr. Lockmuller testified that he did not think a hard slap caused the injuries to the left side of the victim's head. He said it would have been unusual but not impossible for a motor vehicle or ATV accident to cause the victim's injuries. He said a slap would not have exacerbated any injuries sustained from an ATV accident. He agreed that someone might appear intoxicated hours after sustaining a head injury.

The Defendant testified that on September 10, 2012, Mr. Johnson picked him up around 6:00 or 7:00 p.m. He said they dropped off Ms. Williams at The Shack and drove to "Thunder Road." The Defendant and Mr. Johnson left around 9:30 or 10:00 p.m. and returned to the bar to pick up Ms. Williams. At the bar, the Defendant saw the victim, Ms. Williams, Ed Warren, and Mr. Brummett and his girlfriend. The Defendant ordered a beer. The Defendant said the victim looked "messed up" and intoxicated, was confrontational, and wanted to discuss their mother. The Defendant said that he told the victim that he did not want to discuss her and that he moved to another seat twice. He admitted he grabbed the

victim by the shirt, leaned the victim's chair toward the floor, and told the victim that he did not "want to hear it." The Defendant said he moved to another seat, and the victim followed him. The Defendant repeated that he did not want to talk to the victim about their mother. Mr. Warren announced that the bar was closing and asked the victim to leave the bar, and the victim complied. The Defendant said Mr. Warren locked the door after the victim left.

The Defendant testified that he returned to his seat for about ten to fifteen minutes and that he decided to go home. He said that as he left the bar, the victim appeared in the parking lot from around the corner of the building and quickly walked toward him. He thought the victim's manner was confrontational. He thought the victim was "messed up" and admitted he slapped the victim across the face once with his open hand. He denied hitting the victim with a closed fist and more than once. He denied seeing a cinder block nearby and hitting the victim with it and said he would not have hit his brother with a cinder block. The Defendant said Mr. Johnson was either standing on the porch or in the doorway when the victim approached.

The Defendant testified that the victim "melted" after the slap and that he guessed the victim was unconscious. The Defendant said, though, that the victim had "a bad problem of hollering wolf." He said the victim did not fall backward or to the side after the slap. He said Mr. Johnson was the only person outside the bar when the confrontation occurred. Afterward, the Defendant said he sat on the porch and did not check on the victim because he did not think the victim was hurt. He said Mr. Johnson checked on the victim. The Defendant said the victim was not bleeding after he fell.

The Defendant testified that he remained on the porch, that Mr. Ed Warren went home, and that Mr. Johnson and Ms. Williams attempted to move the victim. Mr. Johnson and Ms. Williams had difficulty moving the victim, and they left to find Mr. Warren. The Defendant said the victim never spoke to him, but Mr. Johnson told the Defendant that the victim spoke. Mr. Johnson, Mr. Warren, and Ms. Williams moved the victim to the victim's truck while the Defendant remained on the porch. He said he did not help because he had "a bad back and couldn't lift." He said the victim seemed dazed and "acted like he was walking" when they helped him to the driver's side of the truck. The Defendant said that while they were at the bar, he provided Ms. Williams the victim's wife's and children's telephone numbers and asked Ms. Williams to tell them to pick up the victim. The Defendant, Mr. Johnson, and Ms. Williams left the bar immediately after the victim was placed inside the truck. He thought the victim was okay.

The Defendant testified that his sister called the next morning to tell him about the victim. He said he did not do anything after learning of the victim's condition because there was nothing he could do. He said he returned to the bar later that afternoon. He admitted

he told his siblings that he slapped the victim and said his version of events never changed. He said that he and the victim had previous confrontations and that he had always walked away from the victim.

On cross-examination, the Defendant testified that the victim was aggressive at times and that he thought the victim was aggressive "in a way" that night. He said he asked the victim three times to leave him alone, but the victim refused. He denied he and Mr. Johnson were "bar hopping" that night and said he ordered one beer at The Shack and maybe two beers at Thunder Road. Relative to the Defendant's leaning the victim's chair backward inside the bar, he denied he attacked the victim. He said he provided Ms. Williams the telephone numbers before leaning the victim's chair backward.

The Defendant testified that he did not watch Mr. Johnson, Mr. Warren, and Ms. Williams drag the victim to the truck but that he walked to the victim's truck to ensure the victim was inside. He said he did not watch them drag the victim across the parking lot or place him inside the truck. He agreed Mr. Johnson never stood between him and the victim. He said that he never moved from the porch while Mr. Johnson and Ms. Williams left to find Mr. Warren and that the victim lay on the ground during that time.

The Defendant testified that the victim did not attempt to hit him while they were inside the bar and that he did not attempt to hit the victim. He said neither of them had weapons that night. He said that although the victim did not attempt to hit him outside the bar, he thought the victim was going to hit him because the victim came toward him aggressively and because the victim said he was going to talk to him. He denied he caused the victim's injuries and said he left the victim inside the truck because he had no reason to believe the victim was "in that bad a shape." He did not recall the victim's wearing a hat that night.

On redirect examination, the Defendant testified that he did not see physical signs of any injury. He said he did not call anyone because he did not think the victim was hurt badly from a single slap.

Upon this evidence, the jury found the Defendant guilty of voluntary manslaughter, and the trial court sentenced the Defendant to six years' confinement. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his voluntary manslaughter conviction. Although he concedes the evidence supports a conviction for criminally negligent homicide, he argues the State failed to establish he committed an intentional or knowing killing as required for a voluntary manslaughter conviction. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Whether an act is committed under adequate provocation is a question of fact for the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). As relevant here, a person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a) (2014). A person acts knowingly when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-11-302(b) (2014). In the context of voluntary manslaughter, intent is shown if the defendant has the desire to cause the victim's death or acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See State v. Page*, 81 S.W.3d 781, 790-93 (Tenn. Crim. App. 2002).

In the light most favorable to the State, the record reflects that the victim was found non-responsive inside his truck on September 11, 2012, and that the cause of death was blunt force trauma to the head. The wound to the left side of the head was consistent with having been inflicted by a portion of a cinder block found the day after the incident and about ten yards from where the incident occurred. The wound to the right side of the head was consistent with falling backward to the ground. Before the injuries were inflicted, the Defendant and the victim spoke inside the bar. Although the Defendant did not want to discuss his and the victim's mother, the victim persisted in attempting to talk to the Defendant. The Defendant grabbed the victim, leaned his chair backward, and told the victim to leave him alone. The Defendant changed seats two or three times in an attempt to get away from the victim. Although the Defendant thought the victim went home when Mr. Warren announced closing time, the victim appeared outside when the Defendant and Mr. Johnson left the building and attempted to talk to the Defendant again.

Although the Defendant testified that he only slapped the victim once, the medical examiner testified that one hard slap would not have caused the victim's injuries. The jury's verdict reflects that it discredited the Defendant's testimony that he slapped the victim with his open hand. In any event, the record reflects that the Defendant saw that the victim "melted" as he fell on the ground. The Defendant "guessed" the victim was unconscious, but he sat on the porch of the bar, did not check on the victim's well-being, offered no assistance to Mr. Johnson and Ms. Williams to move the victim, and did not seek medical treatment for the victim. While Mr. Johnson and Ms. Williams were gone to seek Mr. Warren's assistance, the Defendant sat on the porch while the victim lay motionless and unconscious on the ground. After the victim was dragged across the parking lot and placed inside his truck, the Defendant, Mr. Johnson, and Ms. Williams returned to the Defendant's house for dinner.

We conclude that the evidence is sufficient to support the jury's verdict. The victim's repeated attempts to talk to the Defendant about their mother and the Defendant's perception that the victim was confrontational provides sufficient evidence for the jury to have found the Defendant acted pursuant to adequate provocation. Likewise, the jury could infer that the Defendant's grabbing a piece of cinder block and striking the victim shows his conscious objective to engage in the conduct that caused the victim's death. The Defendant intentionally engaged in the conduct leading to the victim's fatal injuries.

The evidence also reflects that the Defendant was aware his use of the cinder block was reasonably certain to cause the victim's death. Although the victim had no visible injuries after the Defendant struck the victim's head with a cinder block, the victim's lying motionless and unconscious on the ground after falling shows he was severely injured. The victim's son noticed immediately upon finding the victim in the truck that something was wrong. Other noteworthy factors which support this finding include the Defendant's

obtaining the cinder block, his use of the cinder block upon the unarmed victim, the Defendant's calmness after the killing, his failure to obtain medical attention or render aid to the victim, and the Defendant's lying to police after the victim died. The Defendant is not entitled to relief on this basis.

## II

### Sentencing

The Defendant contends that the trial court abused its discretion during sentencing by misapplying enhancement factors (2) and (5). He requests a reduced sentence, but he does not challenge the trial court's denial of alternative sentencing.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

At the sentencing hearing, the presentence report was filed with the trial court. The report shows the Defendant had previous convictions for two counts of public intoxication, casual exchange, and possession of drug paraphernalia. The Defendant admitted, though, that he had two public drunkenness convictions, which were not found during the presentence investigation. He graduated from high school. He reported having poor health,

which he attributed to years of labor-intensive work. He reported chronic pain, high blood pressure, COPD, and a sleeping disorder and said he took medications for his illnesses. The Defendant had received Social Security disability benefits since 2011. He also reported struggling with depression and periodically taking medication. He was treated previously at Cherokee Mental Health for his depression and was told by the staff that he no longer needed treatment. The Defendant denied having a drug or alcohol problem, and although he acknowledged the public intoxication convictions, he denied he had been intoxicated recently. He admitted drinking alcohol on the day of the offense but denied being intoxicated. The Defendant admitted smoking marijuana from age eighteen to three years before the offense.

Patricia Masingo, the victim's wife, read a previously prepared statement addressed to the Defendant. In the statement, she questioned how the Defendant became a cold-hearted murderer and how he could have hated the victim so much. She noted Dr. Lockmuller's testimony proved the Defendant killed the victim with "one lick." She speculated the victim "didn't see it coming" and said the cinder block the Defendant concealed in his hand killed the victim. She believed the Defendant knew the extent of the victim's injuries but did nothing to help. She discussed her depression since the victim's death and said she hoped the Defendant lived a long time knowing he had killed his brother.

Thomas Masingo, the victim's youngest son, read a previously prepared statement to the trial court. In the statement, he said that the victim called him the baby and that they were good friends. He said the victim called him daily, and he recalled the victim's last words to him were "I love you, Thomas." He said his wife was pregnant with twins, who would learn of their grandfather through photographs. He expressed his sadness over the victim's death and said the Defendant was cold and heartless.

Arlos Masingo, Jr., the victim's eldest son, read a previously prepared statement to the trial court. In the statement, he described watching the victim's taking his last breath in the hospital after the assault. He said that although his father was not perfect, he was reliable and loved his family. He said that the thought of his father lying inside the truck overnight haunted his family and that everyone wondered if the victim would have lived had someone called for help. He noted the Defendant's lack of remorse and his absence at the hospital and the funeral. He requested the Defendant serve the maximum sentence allowed by law.

Travis Masingo, the victim's other son, prepared a statement that was read to the trial court by the prosecutor. In the statement, he said that he and the victim were close and that he had experienced a "great loss." He said his daughters no longer had a grandfather. He said he had difficulty sleeping and took medication because he always saw the image of his

father lying inside the truck and gargling. He wanted the Defendant to receive the maximum sentence because he knowingly left the victim to die and was a mean and cruel person.

The trial court sentenced the Defendant as a Range I, standard offender to six years' confinement. Relative to enhancement factors, the court found that factor (1) applied based on the Defendant's previous convictions contained in the presentence report. *See* T.C.A. § 40-35-114(1) (2014) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court also found that factor (2) applied based on the numerous codefendants charged as accessories after the fact. *See id*. § 40-35-114(2) ("The defendant was a leader in the commission of an offense involving two (2) or more criminal actors[.]"). We note the codefendants' trials were scheduled to begin after the Defendant's sentencing hearing. The court, likewise, found that factor (5) applied. *See id*. § 40-35-114(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense[.]"). The court found that no mitigating factors applied.

Relative to the manner of service, the trial court noted the Defendant's maintaining his actions did not cause the victim's injuries despite the forensic evidence at the trial that the victim received a very strong blow, which was inconsistent with an open-handed slap. As a result, the court found that the Defendant had not acknowledged any responsibility for the victim's death. The court noted the Defendant's minimizing his drug and alcohol use during the presentence investigation. The court found that no evidence was presented about the Defendant's possible intoxication on the day of the incident and that the Defendant's refusal to acknowledge he "uses or has continued to use substances cuts against" the Defendant's assertion that he might be rehabilitated through alternative sentencing. The court found that it had no "hopes of rehabilitation." The court found that no evidence showed the Defendant would or would not comply with the conditions of probation and that full probation would unduly depreciate the seriousness of the offense.

The trial court stated that the Defendant had exhibited cold and callous behavior by allowing the victim to remain inside his truck overnight and by disregarding any responsibility to help the victim. The court said that such behavior did not support alternative sentencing. The court found, though, that no evidence showed the Defendant was a risk to the community generally. Based on the court's finding that the Defendant would not be rehabilitated through alternative sentencing, the court ordered the Defendant to serve his sentence in confinement.

Relative to enhancement factor (2), the Defendant argues that although multiple people were charged as accessories after the fact, the codefendants' cases had not been resolved at the time of sentencing. The Defendant claims that he was the only actor during

the commission of the crime because he was the only person who struck the victim and that the actions of the individuals charged as accessories after the fact cannot be used to enhance the length of his sentence.

In this case, the Defendant was indicted for second degree murder, and the numerous individuals at issue were charged as accessories after the fact, which is a separate and distinct offense from second degree murder. *See* T.C.A. § 39-11-411(a) (2014). In relevant part,

> [a] person is an accessory after the fact who, after the commission of a felony, with knowledge or reasonable ground to believe that the offender has committed the felony, and with the intent to hinder the arrest, trial, conviction or punishment of the offender . . . [h]arbors or conceals the offender [or] [p]rovides . . . the offender with any means of avoiding arrest, trial, conviction or punishment[.]

*Id.* § 39-11-411(a)(1), (2). Although accomplice testimony requires corroboration, testimony by an accessory after the fact does not require corroboration. *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013).

The evidence shows that the Defendant, the victim, and Mr. Johnson were the only people outside the bar at the time the Defendant struck the victim. Although the Defendant initially told the police that Mr. Johnson stood between him and the victim, the Defendant recanted in a subsequent police statement and testified that Mr. Johnson was on the porch at the time the Defendant struck the victim. The evidence at the trial shows that the Defendant was the only person who struck the victim, which was the conduct leading to the victim's death. It was only the Defendant who struck the victim with the piece of cinder block, and the medical examiner testified that he could not conclude the victim would have survived had the victim received immediate medical attention. No evidence shows that Ms. Williams, Mr. Warren, and Mr. Johnson actively participated with the Defendant in committing the homicide or that the Defendant instructed them what to do after the victim was unconscious. To the contrary, the evidence shows that these individuals were involved only to the extent of moving the victim to his truck after sustaining fatal injuries, and the Defendant sat quietly on the porch. The codefendants' charges are not determinative, and the facts fail to show anyone other than the Defendant was involved in the assault. As a result, we conclude that the Defendant was the only person responsible for the commission of the homicide and that the trial court erred by applying enhancement factor (2).

Relative to enhancement factor (5), the Defendant argues that his leaving the victim overnight inside his truck did not constitute exceptional cruelty. A trial court's finding that factor (5) applies requires findings of conduct "separate and apart from the actions which constituted the offense[.]" *State v. Poole*, 945 S.W.2d 93, 99 (Tenn. 1997). Furthermore, the facts must show "infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (internal quotation marks and citation omitted). Enhancement factor (5) is most applicable in cases involving torture and abuse of a victim. *See State v. Davis*, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991); *State v. Haynes*, 720 S.W.2d 76, 86 (Tenn. Crim. App. 1986). However, this court has upheld the application of enhancement factor (5) in the absence of such torture based on the severity of a victim's injuries. *See State v. Gray*, 960 S.W.2d 598 (Tenn. Crim. App. 1997).

In *Gray*, the evidence showed that the victim was beaten severely, sustaining a laceration to her scalp, abrasions above her eye, back, right side, hip bone, and thighs, bruises to her breasts, and markings on her arms and wrists. The victim, likewise, sustained a skull fracture and internal hemorrhaging of the small bowel and left breast. *Id.* at 611. In essence, the victim in *Gray* sustained numerous external injuries in addition to the skull fracture that led to the victim's death. *Id.*; *see State v. Jeffrey Scott*, No. W2009-00707-CCA-R3-CD, 2011 WL 2420384, at *32 (Tenn. Crim. App. June 14, 2011), *perm. app. denied* (Tenn. Oct. 18, 2011).

Although the victim in the present case sustained a skull fracture and internal bleeding as a result of blunt force trauma, the evidence shows that the victim had no external injuries from the altercation. The Defendant struck the victim only once, and although he refused to assist in moving the victim to his truck, no evidence shows that his conduct was intended to inflict pain upon the victim for the sake of inflicting pain or to provide the Defendant gratification. To the contrary, the Defendant maintained that he was unaware the victim was seriously injured. We note that the Defendant testified that he provided Ms. Williams with the victim's contact information and that he requested she contact the victim's family. As a result, we conclude that the trial court erred by applying enhancement factor (5).

Although we have concluded that the trial court erred by applying enhancement factors (2) and (5), the Defendant is not entitled to relief as a matter of course. The court's misapplication of these enhancement factors "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. The Defendant concedes that the court properly applied enhancement factor (1) based on his previous convictions. We note that according to the presentence report, the Defendant had previous convictions for two counts of public intoxication, casual exchange,

and possession of drug paraphernalia. The Defendant admitted, though, he had two additional public drunkenness convictions not found during the presentence investigation. The court expressed great concern relative to the Defendant's lack of potential for rehabilitation because he had refused to accept responsibility for his conduct and to admit the possibility that his conduct resulted in the victim's death. The court noted the Defendant's cold and callous demeanor and found the maximum sentence was required to avoid depreciating the seriousness of the offense. The record reflects that the trial court considered the appropriate purposes and principles of our sentencing statutes and imposed a within-range sentence, and we conclude that the record supports the imposition of a six-year sentence.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE